The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning. The first case for argument this morning is 19-1420 Lobolo-Watts Constructors v. Secretary of the Army. Is it Mr. Brody? Was your name pronounced correctly? Brody. Brody. Okay. Why don't you have you begin, sir. Yes. Good morning, Your Honors. May it please the Court. This case is about being blindsided by the government's stipulation that only quantum was involved in the case. The government's brief stipulated that we are here only for quantum. The pre-hearing brief stated only quantum was an issue and the board noted that only quantum was an issue. Instead, the board knocked out the costs that were incurred by appellant before the board in performing the installation of MC cable that was allowed by the original specifications in concealed areas in October and September of 2012. The final decision by the contracting officer acknowledged that that was a change in the specifications in that it allowed the installation of MC cables in the overhead hung ceiling areas, acoustical tile areas, and under the floor areas, even though those tiles could be removed by somebody climbing up there and removing the tiles or picking up the floor panels. Can I just, sir, sorry to interrupt, but I just want to get some clarification because to a certain extent on this point it seemed to me that maybe the parties were arguing sort of past each other. The question you're raising here, does this have to do with expenses incurred like just in the month of September 2012 and maybe part of October 2012 when you were proceeding in installing the MC cable before the final word came down? Is that what is in dispute here? That's one of the three major items, Your Honor. Well, is that the item, but in terms of your quantum, let's call it your quantum argument, is that what your quantum argument is about? No, not exactly. It's part of it. It is, one, installing the MC cable in September and October before we got a decision from the contracting officer representative on October 17th, but then it's removing all the MC cable that was installed, which is number two. Well, let me ask you about that before you move on. Before you move off of that point, in terms of the issue of removing what was already installed, is that what was already installed, was that just what was installed in the September and October period, or did that involve stuff that was MC cable that was installed prior to that? No, it was just in September and October, Your Honor, of 2012. This is Judge Toronto. Can I ask you a question? When did the government in the board first assert what I know that it eventually asserted, that it was unreasonable and a violation of the duty to mitigate damages to do the installation of the MC cable? The MC cable that is now at issue and that those costs, the installation and then the removal, are not awardable as a matter of the quantum piece of the case because of the mitigation and reasonableness requirements that apply to that side of the case. And therefore, that's independent of the stipulation about the change of construction. I know that I think the board, the government did say that in a brief to the board that's in the appendix, but when did it first say that? It never said it. It never said it, Your Honor, during the entire hearing. I thought I was remembering seeing in the joint appendix, and I'm sorry, I don't have the page numbers, an explicit section of its brief that says, This is not recoverable because once non-contracting officer core representatives said you really, really need to put the rigid stuff up there, not the flexible stuff, it was unreasonable to proceed. That didn't happen, Your Honor, until the final decision, not the final decision, but if you look at appendix 1301, the October 17, 2012 letter from the contracting officer, Oris Cleary, the contracting officer's representative. At that time, they hereby directed the contracting officer technical representative directed Lobola Watts to proceed with the installation of EMT for the entire electrical distribution system above the ceiling and below the floors at that time. And basically, Your Honor, if you look at the final decision, which is found on appendix 1081, the actual contracting officer states that until serial letter 0008, which is the October 17 letter. Can I just interrupt you? So I guess what I'm particularly thinking of is appendix pages 3385 to 3388, which is in the paragraph in the government's red brief at page 14. And those pages, I think, are a government brief to the board that says that discuss appellant's failure to mitigate damages as a reason not to award amounts for the installation of the flexible cable in the ceiling or amounts for the removal of that. This was the post hearing brief. This is after the hearing. And Your Honor, I clerked for Judge Whitaker back, let's say, a half a century ago. But Judge Whitaker and J.A. Ross versus United States 115 fed sup 187 back in 1953 stated that when you have a dispute where the inspector raises this issue, you have to go to the contracting officer to get his decision. To make the change. And without registering a protest and getting the decision from the contracting officer, which we didn't get until October 17, you basically are doing it as a volunteer. Especially when it's a defective specification. And that's the problem. We tried the case without knowing that the government was ever raising this issue when they specifically came back and stated that only quantum was involved. And therefore, we put in the cost of putting in the NC cable that we had a rip out and the additional cost of putting in the electrical metal tubing that cost three or four times as much, especially when you're having all the duct work and everything else in the way. Which, you know, happened throughout the last part of 2012 and the early part of 2013. That's where, you know, the bubble was. And Walsh got killed because this was critical work that you had to enclose all the mechanical, electrical, and duct work. Counsel, can Judge O'Malley ask a question, please? Counsel? Yes. All right. My question to you is when you were working on this and you were initially told by government representatives, and I understand it was not the contracting officer, but you were initially told not to install NC cable, were there timing requirements under the contract that required you to start installing the wire when you did? Would there have been penalties had you not met certain timing requirements with respect to the project? Yes, Your Honor. Exactly. The work was supposed to go in September and October. You had to install the mechanical, electrical systems, the lighting systems, the power systems, the distribution systems in the ceilings, you know, at the same time as the duct work and everything else so that you can enclose the ceilings in November of 2012, which was then on the critical path. If you waited until October 17th, you know, the whole project would have been delayed by three months. And is that in the contract? Can you point where in the contract that those timing requirements appear? Yes, Your Honor. It's in the scheduling requirements. Under the scheduling clause of the contract, the government approved the schedule back in, I believe it was October of 2011, which showed that all the work in the ceilings had to be put in as a critical item by November of 2011. Otherwise, the project would be delayed. So if you waited until you got this notice on October 17th saying, you know, we're not going to approve any work that's not an EMT for the electrical distribution, the lighting system, the security system, et cetera, the single-phase systems in the ceiling, you know, you would be dead in the water. It would have been a lot bigger claim, you know, awaiting for the three months between September, October, and starting it all over in November. I understand your argument about acting as a volunteer if you were to move forward. What else could you have done at that point to mitigate other than put in the request for clarification? Nothing except we went and we asked for clarification on RFI in September. What came back was the architect engineer or the Corps of Engineers designer came back and said, no, we want you to utilize only in the walls, not in the ceilings, not in the floors, all right, because it's accessible. Well, anything's accessible. If you had a jackhammer, you could even knock out, you know, the walls, all right? If you take down the ceilings or you pick up the floors. And then they came back and both Lobola Watts, the prime contractor, and the subcontractor came back saying, that's all wrong, okay? We did this job as putting in cable, empty cable, flexible cable, not EMT, all right? And we wanted decisions from the contractors, officers. We didn't get that until October 17th, which is appendix 1301 that also is cited by the final decision in 1081. It's letter C0008, dated October 17th, 2012. As soon as we got that letter, we started saying, okay, we're going to rip everything out and start again. And meanwhile, the duck man and everybody else was putting in everything. And so it was terrible now to put in EMT for the rest of 2012 and the early part of 2013. That's where, you know, the million dollars came from on watch. I'd like to stop you sometime for rebuttal, Your Honor. Yes, please. Let's hear from the other side and we'll reserve the remainder of your time for rebuttal. And it's your vote. May it please the Court. Lobola Watts was not blindsided. The government had made clear, going back to before this board litigation even began, in the contracting officer's final decision, for example, starting at appendix 1081. The government had made clear that it did not agree that these costs of having this wasteful effort of installing the MC cable against the government's wishes, that the government did not believe that those were recoverable. And that continued to be the government's position all throughout. Whether you put the mitigation theory to it or any other theory, reasonableness, causation, the point the government has always made is that while it would agree that the contract initially wasn't clear enough, perhaps, that the government, during the performance of the contract, was at all times totally clear that they believed that the rigid EMT was required and that's all that they would accept in these spaces. But it was found, counsel, was found to be a material change in the contract, correct? The contract, yes, the contracting officer did agree. Right. But if you look at that contracting officer's final decision, for example, on appendix 1080, you see the contracting officer explaining that there was ambiguity in the contract. So the issue wasn't that there was any ambiguity in the Corps' instructions during performance of the contract. But it is true, is it not, that counsel is correct that if one proceeds upon the direction of those on site or the architect, for instance, but without the approval of the contracting officer, that they're proceeding at risk if it turns out that the contract doesn't really require the more expensive work to be done. Isn't that right? They become a volunteer. Just tell me whether that's the law or not. It's not that simple as yes or no because it depends on what the contractor does. So if the contractor puts the government on notice, I disagree with your interpretation, the contracting officer on notice, I disagree with the interpretation of the contract that you're enforcing, this will be a change to the contract which will result in additional costs. The contractor then is not at risk because if the contractor ultimately proceeds, the contractor has protected itself by putting the government on notice that it views it as a change, and then it would proceed in accordance with the decision. So what case says that? Because I have seen it many times say the opposite. In other words, that even if you put those on site on notice that you don't think that's what the contract requires, if you proceed, you're still just going to be treated as a volunteer. Well, Your Honor, I would look to the cases, and I'm sorry I don't have a specific one that's coming to mind, but I would look to the cases that address how the changes clause operates and the obligation to put the government on notice, and that if you do that, you then can, under the changes clause, recover the additional compensation. I think the same cases, I would believe, the same cases that address these constructive changes would show that as long as you put the government on notice as required by the changes clause, that if you ultimately do then show that there was a constructive change, which the contracting officer... All right, so you can't cite me to any case? I'm not sure of a specific case at this time. You're right, Your Honor. Okay. Go ahead. Well, let me just add, and this is Judge Prost. Just following up on what my point was, I mean, we see numerous cases in which the government comes in, and it's on the other side of these cases, and it says, no, no, no, no, the contractor, the person shouldn't have been doing this because it's only the contracting officer that has the authority to change or fix something. And here, that person didn't step into this until the weeks following the September 12th conversation, right? September 2012 conversation, right? When was the contracting officer's first entree into this discussion? Actually, Your Honor, I believe it was over a year later, and the reason it was over a year later was because Lobola Watts didn't go to the contracting officer for a final decision until January of 2014. And so this was something that happened, came up in September of 2012. And so Lobola Watts could have, if it had wanted to, go right then to the contracting officer and demand a resolution of what the contract required or whether the contract needed to be changed. But it didn't elect to do that. Instead, it elected to resolve the issue, not in a very good way, but resolve the issue with the resident engineer's office, which admittedly is not the contracting officer. But ultimately, it's the same personnel within that resident engineer's office that Lobola Watts ultimately decided to follow their direction without going to the contracting officer until 2014. Can I just ask a point of clarification? There's this October 17th letter that is signed on behalf of the contracting... October 17th, 2012 letter that is signed on behalf of the contracting officer's representative. Is that consistent with what you just said about a whole year later? Yes. My understanding is that that October letter was signed, I believe it was, by the resident engineer. The title, underneath the signatory's name, it says, Contracting Officer's Representative. Right. And so the contracting officer's representative is a different official than the contracting officer. The contracting officer's representative is given limited, delegated, limited authority, but not the authority to change the contract. And so the contracting officer's representative will sometimes be... It could be a government construction manager, as I say, somebody in what's often called the resident engineer's office, which would be an engineering office at the facility. And so this is not the contracting officer. And the contracting officer's representative is a distinct person from the contracting officer. Okay. What about the period from September 2012 till they got the final response that Judge Toronto was just referring to? During that period, didn't LaBeouf-Watts act perfectly reasonably by seeking... When the government suggested there was a different issue, an issue here, by seeking a definitive, dispositive response, given what the contract otherwise required? The part that was unreasonable, Your Honor, was not the act of seeking a definitive response. That was perfectly reasonable. The part that was unreasonable and the board properly rejected compensation on was the decision to go ahead in contravention of what the course position all along was. LaBeouf-Watts was on notice by September 4th, before any of this cabling was installed. Were there scheduling deadlines in the contract? So there are scheduling deadlines in the contract, but, again, there are a number of ways to handle this. And so if LaBeouf-Watts feels that this must be resolved before they can proceed, one way a contractor can handle this is by telling the contracting officer right then and there, not a year or two later, but telling the contracting officer right then and there, I'm being directed to do this. I don't believe that's what my contract says. I can't proceed until you change the contract, if this is what you want, and I believe this will delay the project if a resolution doesn't happen immediately. And if they didn't meet the deadlines, then they would have penalties, right? Unless they could demonstrate that there was excusable delay while waiting for a resolution of this issue from the contracting officer. Right, and the burden would be on them. To demonstrate an excusable delay, it would. But that's not the course LaBeouf-Watts took. The problem the board rightly found here was that LaBeouf-Watts didn't go to the contracting officer. It ultimately accepted, initially, the resolution of the resident engineer's office and decided to seek its additional cost, which is something it could do. But what it couldn't do was disregard that instruction initially and go through this wasteful effort of installing something that all along the Corps was saying they wouldn't accept. When it comes to the stipulations, LaBeouf-Watts argues at length that stipulations are binding, but it doesn't show that the board rejected any of the parties' stipulations. The parties didn't stipulate that LaBeouf-Watts was entitled to recover any particular amount or any particular element of its cost claim. Indeed, that was the dispute, that the government didn't believe that much of LaBeouf-Watts' claim costs were properly recoverable, even if there was a constructive change. The argument that LaBeouf-Watts makes second, that the board erred in concluding that the contract had been changed, that's contrary to the agreement of the parties that this should be treated as a constructive change, and that's the manner in which the board resolved the case by agreement of the parties. There's simply no basis to disturb the board's conclusion or its ruling in this case. And for these reasons and those expressed in our brief on the board's opinion, we respectfully request that the court affirm the board's ruling. Any further questions by the judges? Okay, thank you. Your Honor, may I have a couple minutes to rebuttal? Yes, sir. If you look at the final decision of the contracting office, which is 13 pages, the 13 pages never raises this issue. And in fact, you know, states on the page that I did state on 1081, that serial letter 008 gave clear, direct instruction to LaBeouf-Watts to install the EMP above the ACT. Okay? And these areas will prohibit. It was a defective design. We had that problem at Fort Meade on a number of cases that, you know, they think it's highly secured, okay, and they don't want somebody punching up the ceilings or taking up, you know, the floors. The floors were five feet deep. It was lots of mechanical and electrical. But that's not what the specs said. And it was an addendum that came out that specifically said, we're not doing NFPA. We're going to allow you to utilize single-phase MC cable. And that's substantially cheaper to install. Now, one of the things is, if in fact the contracting officer in his final decision, the real contracting officer, not the technical rep, but, you know, he kind of ratified what the technical rep said. And he says that was definitive, all right, on October 17th. That's when we stopped putting it in and we started ripping it out and changing to EMT for the next six months. The only thing that the contracting officer raised is instead of your actual cost, you know, our independent government estimate based upon means said this is what it should cost to install EMT instead of MC cable. So that should be $500,000 or $600,000. So, you know, why did the government just stipulate quantum if it believes that, you know, this was a big issue? Because this killed it. This is two-thirds our claim. That was knocked out. Counsel, before you sit down, can I ask you about the $123,000 equitable adjustment? Yes, Your Honor. That's very important, okay? What we did was put together the actual cost. You know, and I teach this at GW, or at least I taught it for 20 years, and we still cite D.A. Ross and, you know, our last textbooks, all right? But when we put together the actual cost, we noted that, in fact, progress payments were made towards this distribution, even though the inspector said, no, you've got to put it in EMT. They approved progress payments in September and October that amounted to paying for some of the hangers, paying for some of the equipment, and paying for the superintendents and everything else. That's worth $123,000. So that was a double dip. That's why we knocked off the $123,000. But that was in the excess amount. Remember, the government allowed the means book, okay? You know, it had nothing to do with the actual cost. But we put in the actual cost, the invoices for the materials, the time records for the labor that was involved, and everything else, and that's how we put it in as the actual cost according to, you know, the cost and pricing data that we had. You can't take anything off of Fort Meade, all right? Counsel, didn't you admit that you shouldn't have put those in? In the initial claim, yes. Or at least the contractor missed that we got paid progress payments that, you know, allowed us some supervision, some of the hard lift equipment, some of the gasoline, and some of the labor that was expended in September and October. So that's why we knocked that out. In the extra, the additional claim between the half a million dollars, and I'm rounding it off, to the million dollars. Judge O'Malley, did you get your question answered? Yes, I think so. Okay. All right. We thank you. Time has expired. We thank both sides, and the case is submitted. Thank you. Thank you, Your Honor.